HARNISCHFEGER CORPORATION,
Plaintiff,

v.

PACCAR, INC., Paccar Machinery Corpo-
ration, Charles M. Pigott, James C. Pi-
gott, Citicorp, and Citibank, N. A., De-
fendants.

No. 79–C–441.

United States District Court,
E. D. Wisconsin.

July 10, 1979.

Frank J. Pelisek, David J. Cannon, Michael E. Husmann, Michael, Best & Friedrich, Milwaukee, Wis., Walter T. Kuhlmey, Garrett B. Johnson, Leslie D. Locke, John T. Hickey, Jr., Kirkland & Ellis, Chicago, Ill., for plaintiff.

Maurice J. McSweeney, David J. Hase, Richard S. Florsheim, Foley & Lardner, Milwaukee, Wis., for Paccar, Inc., Paccar Machinery Corp., Charles M. Pigott and James C. Pigott.

Laurence C. Hammond, Michael J. Spector, Bruce R. Bauer, Quarles & Brady, Milwaukee, Wis., John E. Hoffman, Jr., Clarence W. Olmstead, Jr., Andrew S. O'Connor, Shearman & Sterling, New York City, for Citicorp and Citibank, N.A.

## MEMORANDUM AND ORDER

WARREN, District Judge.

The complaint in the above-entitled action, together with plaintiff's motion for a preliminary injunction, was filed on June 14, 1979, three days after defendant Paccar announced its intention to make a tender offer for plaintiff Harnischfeger's common stock. The complaint alleges violations of section 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, section 7 of the Clayton Act, 15 U.S.C. § 18 and breaches of fiduciary duties by defendant Citibank.

On June 28 and 29, 1979, an evidentiary hearing was held on plaintiff's motion for a preliminary injunction. At the conclusion of that hearing, the Court rendered an oral decision granting the injunction requested. In a case of this magnitude, it seems appropriate that the oral decision be reduced to a formal written opinion. The following memorandum constitutes this Court's findings of fact and conclusions of law pursuant to rule 52 of the Federal Rules of Civil Procedure.

A preliminary injunction is an extraordinary remedy which a Court should not issue unless the plaintiff carries its burden of persuasion as to all of the four prerequisites. These prerequisites are: (1) the plaintiff has no adequate remedy at law and will be irreparably harmed if the injunction does not issue; (2) the threatened injury to the plaintiff outweighs the threatened injury the injunction may inflict on the defendant; (3) the plaintiff has at least a reasonable likelihood of success on the merits; and (4) the granting of a preliminary injunction will not disserve the public interest. *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products,* 545 F.2d 1096 (7th Cir. 1976).

Although these requirements have been applied very stringently in many cases involving contests for corporate control, the standard with respect to the likelihood of success on the merits is somewhat flexible in the Seventh Circuit. *Mullis v. Arco Petroleum Corporation,* 502 F.2d 290, 293 (7th Cir. 1974).

### Irreparable Injury and Balance of Harm

■ With respect to the issue of irreparable injury, three separate groups are, in fact, involved. On the one hand, the defendants would suffer harm if a preliminary injunction issued because the issuance of an injunction may very well be fatal to the success of any tender offer. On the other hand, plaintiff corporation would also be harmed if an injunction did not issue. Obviously, the management group, insofar as they represent any interest, would be harmed. However, in a case involving a tender offer, the interests of the target company's shareholders, in receiving a cash premium for their shares, may differ sharply from the interests of the target company's management in preventing the tender offer from ever being made to those shareholders. The Court obviously must consider all these interests.

With respect to the balancing of the harm, plaintiff Harnischfeger and its management, if an injunction should issue, obviously will not sustain any harm. The shareholders, however, might lose the value of a premium offer which might never again be made. Defendant Paccar, if history is any guide to us, would suffer harm if the injunction issues since the injunction might be fatal to the offer.

The Court finds that plaintiff would be irreparably harmed if the injunction does not issue and that the balance of harm weighs in favor of the plaintiff in this case.

### The Public Interest

■ With respect to the public interest, I think the public interest here is clearly set forth by section 7 of the Clayton Act. 15 U.S.C. § 18. There is a deep and abiding public interest in maintaining viable competition in this country and that, of course, is the purpose of the antitrust laws. There also is public purpose and interest in maintaining confidentiality of bank records and the viability of the federal securities laws.

The Court concludes that the granting of an injunction pending a final resolution on the merits of this action will not disserve the public interest.

### Likelihood of Success on the Merits

The Court opines that the likelihood of success on the merits is really the crucial question and the one which the Court must discuss in detail.

The first of the three major issues in the case concerns the claimed breach of a fiduciary duty by defendant Citibank. The plaintiff argues that defendant Citibank is to be treated "as an entity," and that as an entity, it has a fiduciary duty to plaintiff which has been breached.

Case law in this area presents contrasting views. The Court in *Washington Steel Corp. v. T. W. Corp.,* 465 F.Supp. 1100 (W.D.Pa.1979), in a similar case found a breach of duty. That decision is currently under appeal. No breach of fiduciary duties were found in the *Humana* cases. *Humana, Inc. v. American Medicorp, Inc.,* 445 F.Supp. 613 (S.D.N.Y.1977); *American Medicorp, Inc. v. Continental Illinois Bank & Trust Co.,* No. 77–C–3865 (N.D.Ill.1977).

In listening to the evidence, the Court was unable to find any evidence that persuaded it, by a preponderance of the evidence, that there was, in fact, a breach of the so-called Chinese Wall.[1] The less than truthful answer of Mr. Constanza to Mr. Harnischfeger over the telephone may not be in the highest traditions of banking integrity, but the Court does not think that

---

1. Citibank relies upon the integrity of each department within the bank and the tradition of maintaining confidentiality. According to the bank, one department will not transfer confidential information to another department. This confidentiality is assured by the department's integrity, the so-called "Chinese Wall."

there was a duty existing at that time such that that evidence in and of itself would constitute any breach of a fiduciary duty, such as to lead the Court to act on this cause of action.[2] In substance, as to the allegations of a breach of fiduciary duty, the Court is simply unable to find a basis for it in the evidence presented.

The second issue concerns the Securities Exchange Act of 1934. Plaintiff alleges that defendant's disclosures are inadequate to comply with the full and fair disclosure requirements of the Federal and Wisconsin securities laws. Since the original complaint was filed, defendant has filed an amended form of the offer to meet some of plaintiff's objections.

There are, however, certain objections that still remain. Plaintiff contends that there is a failure on the defendant's part to disclose an agreement among the Pigott family members not to sell their Paccar stock without first advising other family members and that there is a failure on Paccar's part to disclose its intent to liquidate Harnischfeger's construction equipment division.

There has been a great deal of discussion about the evidence on these issues. The defendants presented clear and unequivocal testimony by Mr. Pigott that there was no agreement. On the other hand, Paccar continued to offer documents to the Securities and Exchange Commission to disclose the stock holdings of various Pigott family members. The Court cannot come to any conclusion that leads me to believe that there has been any proof of an agreement between the Pigott family members. The evidence merely shows a history of a cohesive family with apparently parallel goals and common action.

As to the liquidation, the evidence again presents a conflict. Mr. Pigott testified that the issue was brought up, but that he did not like the idea and was not going to liquidate the division. On the other hand, members of Paccar's staff, subsequent to Mr. Pigott's decision, continued to generate documents that reflect the possibility of the liquidation. The Court is unable to draw from this evidence anything that convinces me that there has been a failure to disclose an intent to liquidate the construction equipment division such that the Court would issue a preliminary injunction on that basis.

The third aspect of the case and the one that the Court finds the most troublesome, involves the antitrust claims. Plaintiff alleges a violation of section 7 of the Clayton Act in at least two product markets: (1) a market relating to large mining excavator loaders, and (2) a market relating to winches for hydraulic cranes.

Section 7 provides that any corporate acquisition is unlawful where "in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly," 15 U.S.C. § 18. The phrase, "in any line of commerce, in any section of the country," has been interpreted to refer to a relevant market which has both production and geographic boundaries. 3 Von Kalinowski, Antitrust and Trade Regulations § 18.01 at 18–2 (1979).

The first order of business is to examine whether, for the two products relied upon by plaintiff in its complaint, relevant markets have been established. As to geographic boundaries, the parties are in general agreement. All of the figures and all of the evidence has related to a world market that was essentially the western world, namely the United States, with some sales abroad.

The more difficult question is whether or not we have a product market that exists. Plaintiff has alleged and sought to establish a product market for primary digger loading tools in the mining industry.

The evidence deals primarily with the machines manufactured by defendant Paccar and by plaintiff Harnischfeger. Paccar,

---

**2.** Defendant Citibank has requested the Court to strike this sentence in fairness to Mr. Constanza. In the Court's opinion, it is necessary that all factors taken into account be reflected in the opinion. Therefore, Citibank's request must be denied.

through its Dart Division, produces the D–600/620 front end loader. It is a wheeled articulated vehicle, capable of speeds up to 15 m. p. h. and has a 15 cubic yard digging capacity. The D–600/620 is capable of various digging and loading operations, and is used in mining, construction, on steel mill slag piles, etc. Harnischfeger manufactures two digging units which it contends compete with the D–600. The first is the heavy electric mining shovel which has a power umbilical cord and relatively limited mobility. Although Harnischfeger offers various sizes of the electric mining shovel, only the larger sizes of that spectrum are in issue, the market for the smaller shovels having pretty much disappeared in the last ten years. The second Harnischfeger unit is its emerging product, the hydraulic mining excavator. The P&H 1200 mobile unit is crawler mounted and has a 10 to 18 cubic yard digging capacity, depending upon the bucket utilized. Apparently, the most common configuration is the 12.5 cubic yard machine.

The critical question for the Court is whether these two lines of products are in competition. It is that simple. Assuming they are in competition, the Court then must determine what percentage of the market Paccar would possess if the proposed merger is consummated.

The most instructive comment from the Supreme Court comes, of course, from *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). There, the Supreme Court indicated that a two-step analysis must be followed. Considering the question of the outer boundaries of a product market, the Court found that they are to be determined by (1) reasonable interchangeability of use or, (2) cross elasticity of demand between the product itself and substitutes for it.

The Court has some question as to whether or not there is cross elasticity of demand between the product itself and the substitutes for it. At first, the Court was inclined to feel that there was absolutely no relationship because there does not seem to be any relationship between the pricing of the front end loader and the P&H 1200. Yet there are innumerable exhibits that have been received in evidence which tout the relative economy of the front end loader as a substitute for the P&H 1200. Cross elasticity of demand may well exist.

■■ On the question of reasonable interchangeability of use between the Dart front end loader and the hydraulic mining excavator, the Court is convinced from the evidence that there clearly is an area of interchangeability. In order to determine whether there is, in fact, competition, however, the Court must look beneath this broad market.

In *Brown Shoe,* the Court instructs:

Within this broad market, well defined submarkets may exist which in themselves constitute product markets for anti-trust purposes. [citation omitted] The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarkets as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. *Id.* at 325, 82 S.Ct. at 1524.

It is clear that these seven criteria are litmus paper tests that must be held up against the proposed submarket in order to determine whether a relevant submarket exists. If a sufficient number of those indicia are present, a valid submarket has been established. A submarket for antitrust purposes may consist of quite different kinds of items. In *United States v. Chrysler Corp.,* 232 F.Supp. 651 (D.N.J.1964) a broad market of trucks existed as well as submarkets delineated by the hauling capacity of the trucks. Each submarket consisted of products of very different kinds. The Court would also note that it is not necessary that all seven criteria be satisfied. Nor, however, is one single factor conclusive in itself to determine the product submarket. *See, United States v. Continental Can Co.,* 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964), *General Foods v. FTC,* 386 F.2d 936 (3rd Cir. 1967), *cert. denied,*

391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968). In *Reynolds Metals Co. v. FTC,* 114 U.S.App.D.C. 2, 309 F.2d 223 (1962), the court found a well defined submarket where only three of the factors were present.

■ The first criterion is whether there is industry or public recognition of the submarket as a separate economic entity. As to the proposed submarket of large mining excavator loaders, the evidence indicates that there is no industry trade organization comparable to the Power Shovel Association that produces literature or facts relating to large mining excavator loaders. On the other hand, by the very nature of these products, a lot of their information is covered by other association material. Plaintiff does not controvert this lack of associational or organizational recognition of the proposed submarket of large mining excavator loaders but apparently argues, through the testimony of witnesses such as Mr. Williams, who was a very persuasive witness by virtue of his experience, that there is some public recognition that the two machines are in competition. The Court thinks the fact that the public recognition of this submarket is difficult to establish is probably due to the fact that it is a relatively small and narrow market and the fact that it has existed for only a short period of time.

The Court is impressed by plaintiff's exhibit 18 in this regard which relates to the application of front end loaders to open pit mining. The exhibit is a Dart promotional brochure. The document discusses the fact that mining systems for open pit mines are in the process of change. It lists the deficiencies of the electric power shovels, including cost factors, maintenance factors and productivity factors, and then moves on to suggest the alternative of a front end loader as a recognized substitute for the electric power shovel.

The Court is of the opinion, frankly, that there is industry recognition of the submarket as an economic entity. Although the submarket is relatively small and the public recognition is somewhat limited, the submarket is nonetheless present.

The second criterion is the product's peculiar characteristics and uses. This is probably the most important aspect that must be considered. There is no doubt that the products each have the technical ability to do certain functions that the other cannot do as well or at all. The Dart machine has the capability of moving at relatively high speeds. It can do such things as road building and clean-up type functions which the P&H 1200 cannot do. Similarly the P&H 1200 can do numerous functions that the front end loader cannot do, *e. g.,* back hoe functions and extremely tough digging. Notwithstanding these dissimilarities, both of these machines can perform certain functions equally well.

Again, the Court was impressed by plaintiff's exhibits 21 and 22. Exhibit 22 is a Dart document, it is a promotional document that contrasts the Dart 600 to hydraulic excavators setting forth the benefit of the front end loaders as a substitute for the hydraulic excavators and touting the savings that can be made. Exhibit 21, which, again, is a Dart document, recites the advantages of Dart loaders as compared to hydraulic or electric shovels. There is no doubt in the Court's mind that there are some peculiar characteristics and uses that are recognizable.

The Court finds that, with respect to the second criterion, there is sufficient evidence that peculiar characteristics and uses exist which support the finding of a submarket.

As to unique production facilities, the Court does not think that there is any real difference between the production facilities nor anything particularly unique about the factories that are used to produce the two machines that are used in the submarket. They are heavy production items and use heavy, strong components. This factor is simply not particularly helpful in helping the Court to determine the existence or non-existence of the submarket.

The next criterion is whether or not there are distinct customers. The Court would opine that there are. Surface miners and

very heavy land or earth moving contractors would constitute the distinct customers for such a submarket.

There is no evidence of distinct prices that would set this market apart. Similarly, the Court is hard pressed to find the existence of any sensitivity to price changes here. As to specialized vendors, there seems to be a group of distributors who deal in this kind of equipment. Some that sold the heavy mining shovels did not sell front end loaders. On the other hand, there is evidence that one vendor does so. These criteria, however, are of little help in determining the existence of a submarket.

In evaluating the seven items, one must bear in mind Professor Von Kalinowski's comments. In his treatise, he states that "*Brown Shoe* has been viewed by some as representing a more realistic approach to the determination of the relevant product market. Under this test, the Court may examine all relevant economic and commercial factors to determine whether one or more smaller submarkets exist within the boundaries of a broad product market." 3 Von Kalinowski, Antitrust and Trade Regulations § 1803[1], at 18–29, 18–31.

Based on the evidence presented to it, the Court is of the opinion that, as to showing a likelihood of success on the merits as to the existence of a relevant submarket, the plaintiff has made a sufficient showing that there is a relevant submarket composed of large mining excavator loaders.

Having made that determination, the Court must move to the question of what impact the proposed combined entity would have on the submarket.

The evidence varies somewhat as to the percentage share of this market which would be held by Paccar and Harnischfeger subsequent to a takeover. The Court has looked at the dollar volume of sales rather than unit sales in considering whether or not the combination is proscribed by the Act. In *Brown Shoe,* a combination of competitors with 4 percent and a .5 percent share of the market was held to be violative of the antitrust laws. In *United States v. Pabst Brewing Co.,* 384 U.S. 546, 550, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966), a combination that would have resulted in a 4.5 percent share of the market, was declared unlawful.

One of the more impressive documents in determining the respective shares of the market in the instant case is plaintiff's exhibit 27A as well as 27B and 27C. The introduction of these exhibits were bitterly contested by the defendants. Nonetheless, they do represent, so far as the Court is aware, the most reliable evidence available in an area where there is no single authoritative source. They cover the first six months of 1979. Considering the figures that are presented in plaintiff's 27A, and looking at a market of large mining excavator loaders, as it is hypothecated there including electric mining shovels, the post-acquisition share of the combined entities would be 22.75 percent. If one considers exhibit 29B, where incidentally the most clearly supportable relevant submarket exists and where the parties are in head-on competition, the post-acquisition share of the market would be 12.53 percent.

Under the guidelines and the case law, it is clear that having arrived at these conclusions from an evidentiary point of view, the Court is constrained to the position that section 7 of the Clayton Act proscribes the tender offer.

The relationship of Paccar and Harnischfeger vis-a-vis the hydraulic crane winches must still be considered.

Harnischfeger is a purchaser; Paccar is a supplier. Paccar manufactures hydraulic crane winches through its Gearmatic and Braden Divisions. At the present time, Harnischfeger does not manufacture hydraulic crane winches, although in the future, according to its plan, it will. The record indicates that Harnischfeger purchased approximately 50 percent of its needs from Braden during fiscal year 1978, with the remainder of its purchases being made from Gearmatic and Funk Engineering. Of the remaining 50 percent of Harnischfeger's winch purchases, approximately 45 percent of those purchases were made

from Funk Engineering.[3] The hydraulic winch manufactured by Funk is produced pursuant to a patent owned by Harnischfeger to which no other winch supplier has manufacturing rights. The record further indicates that there are only five major competitors in the hydraulic winch market and that Paccar controls at least 27 percent of the market.

■ The acquisition of a buyer of a product by a seller of that product is a vertical merger. Although vertical mergers can violate section 7 of the Clayton Act, the Court, in *Brown Shoe*, 370 U.S. at 324, 82 S.Ct. at 1523 stated that the Clayton Act does not render unlawful all such vertical arrangements but forbids only those whose effect "may be substantially to lessen competition or tend to create a monopoly." The question thus presented in the present case is whether, in fact, the vertical merger would tend to "substantially lessen competition" in any line of commerce.

Plaintiff argues that the vertical merger in this case violates the antitrust laws, namely, the Clayton Act Section 7, in at least two particulars. First, plaintiff argues that Paccar, by purchasing plaintiff, would be eliminating a potential competitor, thereby eliminating potential competition. Secondly, plaintiff argues the acquisition of Harnischfeger by Paccar would tie Harnischfeger to Braden and Gearmatic as a customer and thereby eliminate competitors of Braden and Gearmatic, e. g., Funk Engineering, from selling any hydraulic winches to Harnischfeger.

Defendant, Paccar, argues that whether the Court looks at this as a horizontal merger or vertical merger, the facts simply do not support plaintiff's claim that the proposed merger violates section 7 of the Clayton Act.

With respect to the plaintiff's claim that the acquisition will have an effect on the horizontal market, there is insufficient evidence in the record at this time to indicate that Harnischfeger will be eliminated as a present or future competitor of Braden or Gearmatic in the hydraulic winch market. While it is true and uncontroverted that Harnischfeger may soon manufacture its own hydraulic winch, the record indicates that Harnischfeger has not entered the market as a competitor at the present time. Rather the facts indicate that Harnischfeger intends to manufacture hydraulic winches, but the plans are merely in the developmental stage.

■ In this case, where plaintiff is seeking such an extraordinary remedy as a preliminary injunction to enjoin an extremely costly and complex plan for a takeover bid, the Court feels that it cannot grant a preliminary injunction based upon a claim that Harnischfeger "may" enter the market as a competitor. That is too speculative. *Chemetron Corp. v. Crane Co.*, 1977–2 CCH Trade Cas. ¶ 61,717 (N.D.Ill.1977).

In the Court's opinion, the serious antitrust question with respect to the hydraulic winch market is the vertical aspect of the merger. While Paccar claims that it has no intention of foreclosing Harnischfeger, as a division of Paccar, from purchasing hydraulic winches on the open market for the best price possible, the realities of that situation cannot be overlooked. It is more likely than not that a manufacturer that owns a significant purchaser would prefer to utilize the advantages of having a captive market. In *Ford Motor Co. v. United States*, 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972), the trial court held that Ford's acquisition of Auto-Lite, a spark plug manufacturer, violated section 7 of the Celler-Kefauver Anti-Merger Act because its effect was substantially to lessen competition. On appeal, the Supreme Court considered only the remedy ordered by the district court.

Paccar does not argue that a vertical merger will not occur, but instead argues, based upon cases cited within its brief, that the effect of the vertical merger on the

3. In the oral order of June 29, 1979, the Court stated that 60 percent of plaintiff's winch purchases were from Braden and 25 percent were from Funk Engineering. In again reviewing the evidence presented at the hearing, however, the evidence indicates that, on a dollar volume basis, the percentages listed in the written order are the correct percentages.

market will be de minimus or totally non-existent. Paccar's argument that the vertical merger will not effect the market is based upon the long purchase history of plaintiff and the stated intent of the plaintiff to manufacture winches in the near future to meet its needs. The Court, contrary to Paccar's argument, finds that plaintiff has shown a significant and substantial effect on the market as it now exists. The evidence presented concerning the winch market was quite limited. Paccar argues that the Court should not accept the hydraulic crane winch market as a submarket. Contrary to Paccar's argument, however, based upon the *Brown Shoe* criteria discussed above, the Court finds, in fact, a submarket does exist for the hydraulic crane winches.

Paccar would have the Court look at the long purchasing history of Harnischfeger, arguing from that evidence that the potential effect on the market is nonexistent. It cites *United States v. Hammermill Paper Co.,* 429 F.Supp. 1271, 1283 (W.D.Pa.1977), where the Court stated:

> The stable pre-acquisition business relationship between a supplier and the purchaser removes from the area of potential foreclosure that share of the market already occupied.

Even assuming this is true with respect to Braden and Gearmatic, Paccar overlooks the fact that 45 percent of Harnischfeger's winch purchases are made from Funk Engineering. With Paccar in control, it is quite possible that Paccar would remove this 45 percent from the market. In its current corporate condition as an independent corporation, Harnischfeger could purchase the specially-manufactured winches from other winch manufacturers. The loss of this 45 percent, which in the Court's opinion is quite possible, is a sufficient showing of effect on the market for the Court to say that the effect is substantial.

With respect to Paccar's argument that plaintiff intends to manufacture winches in the near future anyway, and therefore will eliminate itself from the competitive market, the Court is not convinced. While it is true that there is evidence in the record to indicate that Harnischfeger is making a concerted effort to manufacture its own in-house hydraulic crane winches, it is possible that Harnischfeger may never enter into such manufacture.

Furthermore, it is quite possible that even if Harnischefger does, in fact, begin production of its own in-house hydraulic crane winches, it may still not manufacture 100 percent of its needs.

■ In the Court's opinion, in light of the evidence now before it, the Court finds that plaintiff has shown a reasonable likelihood that the hydraulic crane winch submarket exists and that the acquisition by Paccar will have a substantial effect on the submarket such that a violation of section 7 of the Clayton Antitrust Act would occur if the takeover culminated in acquisition.

Based upon the above discussion, the Court finds that plaintiff has met its burden of establishing:

(1) that it has no adequate remedy at law and will be irreparably harmed if the injunction does not issue;

(2) that the threatened injury to the plaintiff outweighs any injury the injunction may inflict on the defendant;

(3) that there is a reasonable likelihood that plaintiff will succeed on the merits of its claims that the proposed acquisition would violate section 7 of the Clayton Act in that competition may be substantially lessened in the market for large mining excavator loaders and in the national market for hydraulic crane winches; and

(4) that granting the injunction will not disserve the public interest.

It is hereby ordered that plaintiff's motion for a preliminary injunction restraining defendants Paccar, Inc., Paccar Machinery Corp., Charles M. Pigott, and James C. Pigott, their respective officers, directors, employees and agents and all other persons acting in concert with any of them, from pursuing or taking any action in furtherance of the plan to make a tender offer for, or in any other manner to acquire, addition-

**1160**

al common shares of Harnischfeger Corporation, until the Court has rendered its judgment after a trial on the merits of plaintiff's complaint, is therefore granted conditioned upon plaintiff posting adequate security in the amount of $500,000. The plaintiff's motion for a preliminary injunction enjoining defendants Citicorp and Citibank, N.A. from participating in the proposed tender offer must be and hereby is denied.

SO ORDERED this 10th day of July, 1979, at Milwaukee, Wisconsin.