**LAIDLAW ACQUISITION CORP., Plaintiff,**

v.

**MAYFLOWER GROUP, INC., et al., Defendants.**

**MAYFLOWER GROUP, INC., Counterclaim Plaintiff,**

v.

**LAIDLAW ACQUISITION CORP., Laidlaw Transportation Limited, Michael G. DeGroote, Counterclaim Defendants.**

No. IP 86–602–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 11, 1986.

---

Thomas A. Withrow, Indianapolis, Ind., Donald E. Egan, Chicago, Ill., Paul M. Donovan, Washington, D.C., for Laidlaw Acquisition Corp.

Richard E. Deer, Indianapolis, Ind., Marc P. Cherno, Victor S. Friedman, New York City, for Mayflower Group, Inc.

Arthur T. Perry, Deputy Atty. Gen., Indianapolis, Ind., for State of Ind.

## MEMORANDUM OF DECISION

DILLIN, District Judge.

The Court having heard evidence on the cross-motions of the parties for a preliminary injunction, now grants the motion of the counterclaim plaintiff.

Laidlaw Transportation Limited is the largest private contractor in the United States engaged in busing school children. Mayflower Group, Inc. is second largest.

On May 7, 1986, Laidlaw Acquisition Corp. (Laidlaw) commenced this action by filing its complaint seeking declaratory and injunctive relief against Mayflower Group, Inc. (Mayflower), the individual members of Mayflower's board of directors, and certain state officials, challenging the constitutionality of the Indiana Takeover Offers Act and certain provisions of the Indiana Business Corporation Law, as amended March 5, 1986. Contemporaneously with its initiation of this litigation Laidlaw announced its intention to commence a cash tender offer for all of the outstanding shares of Mayflower common stock. Laidlaw has since filed an amended complaint adding a claim under Section 14(e) of the Securities Exchange Act and a shareholder derivative claim. However, it seeks no preliminary injunction based on these additional claims, which are not here considered.

On May 20, 1986, Mayflower filed its answer and counterclaim against Laidlaw, Laidlaw Transportation Limited (Laidlaw Transportation), Laidlaw's parent, and Michael G. DeGroote (DeGroote), the chief executive officer of both Laidlaw and Laidlaw Transportation, alleging that: (1) Laidlaw's acquisition of Mayflower through its tender offer will violate Section 7 of the Clayton Act, 15 U.S.C. § 18; (2) Laidlaw manipulated the price of Mayflower stock in violation of Section 14(e) of the Securities Exchange Act of 1934; and (3) Laidlaw's offer to purchase is materially false and misleading in violation of Sections 14(d) and (e) of the Securities Exchange Act of 1934.

A two and one-half day evidentiary hearing on the preliminary injunction motions was held before the Court in three phases. First presented was Laidlaw's constitutional challenge to the above referenced Indiana statutes, followed by Mayflower's Williams Act challenges to Laidlaw's tender offer, and finally Mayflower's Clayton Act challenge to the proposed acquisition. At the conclusion of the hearing, on June 6, 1986, Laidlaw withdrew its constitutional challenge to the Indiana Takeover Offers Act, as moot in the light of certain actions taken by the defendant Indiana Secretary of State.

This Court has a general and basic judicial duty to avoid decision of constitutional questions. *See generally J. Nowak, R. Rotunda & J. Young, Handbook on Constitutional Law* 83–85 (1978). This is particularly true when, as here, a state statute is under constitutional attack in a federal court. *Id.* Our determination, discussed below, of the Clayton Act portion of Mayflower's preliminary injunction motion effectively obviates the need for us to consider the constitutionality of the challenged provisions of the Indiana Business Corporation Law. Moreover, that determination effectively moots Mayflower's claims under the Williams Act. Therefore, we need not, and will not, address the various factual and legal issues raised by any of such claims.

■ Initially, we must consider Laidlaw's argument that the case of *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), requires us to dismiss the Clayton Act claim because of an alleged lack of standing by Mayflower to bring it. We cannot accept Laidlaw's position, nor, for that matter, the reasoning of the law review article upon which it is based—despite the esteem in which we hold the scholarly authors of that thesis. *See* Easterbrook & Fischel, *Antitrust Suits by Targets of Tender Offers*, 80 *Mich.L.Rev.* 1155 (1982).

Mayflower seeks an injunction to prevent violation of § 7 of the Clayton Act. *Brunswick* held (not surprisingly) that a plaintiff seeking damages under § 4 of the Clayton Act must prove a personal antitrust injury, but it specifically permitted the respondents/plaintiffs in that case to seek equitable relief pursuant to § 7 on remand. 429 U.S. at 491, 97 S.Ct. at 698. To argue that this Court should hold Mayflower to be without standing on the basis of so frail a reed as *Brunswick* would be to invite an exercise in judicial activism which we quickly decline.

Since *Brunswick*, at least two judges of this circuit have held that § 16 of the Clayton Act confers a private right of action to obtain injunctive relief against an unlawful

acquisition to the target of a hostile takeover bid. *Whittaker Corp. v. Edgar*, 535 F.Supp. 933, 950 (N.D.Ill.) (opinion by now Circuit Judge Flaum), *aff'd mem.*, Nos. 82–1305 and 1307 (7th Cir.1982); *Chemetron Corp. v. Crane Co.*, 1977–2 Trade Cas. (CCH) ¶ 61,717 (N.D.Ill.1977) (opinion by District Judge Marshall); *see also Grumman Corp. v. LTV Corp.*, 665 F.2d 10, 11 (2d Cir.1981) ("[E]ven though the true concerns of the 'private attorney general' may be more 'private' than 'attorney general' [,i]f the effect of a proposed takeover may be substantially to lessen competition, the target company is entitled to fend off its suitor.") In fact, the Seventh Circuit has indicated that it is the *duty* of a board of directors to file an antitrust suit when it believes that a proposed combination would be illegal. *Panter v. Marshall Field & Co.*, 646 F.2d 271, 297 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).

Having determined that Mayflower has standing to pursue its antitrust claim, we turn to its request for a preliminary injunction. After an extensive review of Seventh Circuit decisions concerning the proper standard for granting a preliminary injunction, a panel of that Court recently has identified four factors which are to be considered on a preliminary injunction motion: (1) whether the plaintiff has an adequate remedy at law and whether he will suffer irreparable harm if the preliminary injunction is not granted; (2) whether the threatened irreparable injury to the plaintiff outweighs the threatened irreparable injury the preliminary injunction may inflict upon the defendant; (3) whether the plaintiff has some likelihood of succeeding on the merits and, if so, how likely that success is (the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor); and (4) what impact, if any, the preliminary injunction (or lack thereof) will have on the "public interest." *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 386–88 (7th Cir.1984); *see also American Hosp. Supply Corp. v. Hospital Prods. Ltd.*, 780 F.2d 589 (7th Cir.1986). We have been assured that

"these decisions ... represent a continued affirmation of the traditional equitable factors governing injunctions and the classic roles of both district and appellate courts." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1441 (7th Cir.1986).

As a threshold matter, the movant must establish that it has no adequate remedy at law and that it will suffer irreparable harm if the preliminary injunction is not granted. *Lawson*, 782 F.2d at 1433; *Roland*, 749 F.2d at 386. The virtual impossibility of "unscrambling the scrambled eggs," once these parties are joined in corporate (shotgun) matrimony, if Mayflower should prevail on the merits or if a subsequent government action results in an order of divestiture, constitutes the irreparable harm and inadequacy of remedy required. *See Chemetron, supra; see also* Easterbrook and Fischel, *supra* ("It is possible to argue, with fair support, that unless a merger is enjoined ... before consummation, we may as well forget about attempting to disestablish the resulting firm.")

Even if it were possible to put asunder the parties once joined, Mayflower would still incur irreparable damage. *See Marathon Oil Co. v. Mobil Corp.*, 530 F.Supp. 315, 320–21 (N.D.Ohio), *aff'd*, 669 F.2d 378 (6th Cir.1981), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982). For example, it is an inevitable consequence of a takeover that the acquiring company will gain access to the target's confidential information. *Grumman*, 665 F.2d at 16. This could be devastating in the instant case which finds the principals engaged in head to head bidding wars for private school busing contracts, utilizing such sophisticated bidding techniques as special computer programs. We find, as have other courts of this circuit in similar circumstances, that Mayflower has demonstrated the requisite irreparable injury required by this threshold factor. *See, e.g., Chemetron, supra; Harnischfeger Corp. v. Paccar, Inc.*, 474 F.Supp. 1151, 1153 (E.D.Wis.), *aff'd w/o opinion*, 624 F.2d 1103 (7th Cir.1979).

Another threshold that the movant must cross is to demonstrate that it has some likelihood of succeeding on the merits. *Lawson*, 782 F.2d at 1433; *Roland*, 749 F.2d at 387. As demonstrated by our discussion below, we find that Mayflower not only has some likelihood of succeeding on its Clayton Act claim, but rather a substantial likelihood of doing so.

Section 7 of the Clayton Act is an extraordinarily clear statute. It provides, in pertinent part, that:

> No person shall acquire, directly or indirectly, the whole or any part of the stock ... of one or more persons engaged in commerce, or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition ... may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18. The purpose of the statute is simply "to nip monopoly in the bud." *United States v. E.I. Du Pont de Nemours & Co.*, 353 U.S. 586, 592–93, 77 S.Ct. 872, 876–77, 1 L.Ed.2d 1057 (1957). Congress sought to carry out its purpose by structuring § 7 to arrest mergers tending to lessen competition "in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding." S.Rep. No. 1775, 81st Cong., 2d Sess. 4–5 (1950) (quoted in *Brown Shoe Co. v. United States*, 370 U.S. 294, 318 n. 32, 82 S.Ct. 1502, 1520 n. 32, 8 L.Ed.2d 510 (1962)).

■ The statute and subsequent cases disclose that to discover whether a violation of § 7 is threatened, three separate, but somewhat interrelated, findings must be made. We must determine (1) the relevant line of commerce, or product market, (2) the relevant geographic market, and (3) the acquisition's effect on competition in the relevant line of commerce in the relevant geographic market. *See, e.g., Weeks Dredging & Contracting, Inc. v. American Dredging Co.*, 451 F.Supp. 468, 486 (E.D.Pa.1978). In determining what constitutes the relevant product market for antitrust purposes, the goal is to delineate markets which conform to areas of effective competition and to the realities of competitive practice. *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7th Cir.1977), *cert. denied*, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1979).

Laidlaw urges us to define the relevant product market as all school bus transportation, regardless of whether it is provided by private contractors or by the school districts themselves. Of course, within the outer boundaries of a given product market, well defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1523. We find, in light of the appropriate factors including those delineated in *Brown Shoe, supra*, that, whether private contracting for school bus transportation is considered a *sui generis* market, or a submarket of a broader school bus transportation industry, it is the relevant product market in this case.

■ Laidlaw argues that its competition comes, not only from other private contractors in the market, but also from the school districts to whom the private contractors seek to sell their services. This argument is based on the fact that school districts can always refuse to "go private" for their bus transportation, and that, perhaps more importantly, a school district can always go back to providing its own transportation if the private contract gets too high as a result of the provider having an effective monopoly in the private market. Because the ultimate issue is whether competition may be substantially lessened in the area of effective competition, the appropriateness of including "in-house" activity must turn on an assessment of the economic realities of the competitive situation. *Grumman Corp. v. LTV Corp.*, 665 F.2d 10, 13 (2d Cir.1981).

■ The evidence demonstrates that, despite its recent pronunciations to the contrary, Laidlaw itself actually considers its competition to be other private contractors in the market place. *See, e.g.,* Defendant's Exhibit 64. The only expert witness called testified that the relevant product market is the private contractor market. The

record also shows that, because of practical and political considerations, school districts rarely, if ever, return to public school bus transportation once they have "gone private." Even if they could and have done so, we cannot accept Laidlaw's argument that, just because a school district's demand for private school bus transportation may have an undefined ceiling, school districts should be considered competitors instead of consumers. Obviously, in any market—be it for school bus services or sealing wax—there is some price at which a consumer will decline to buy, and will, perhaps, attempt to supply his needs by self help. However, this does not mean that the customer's decision not to buy can then be considered "competition." Such a position would significantly erode, if not *de facto* repeal, the Clayton Act.

Having found that private contracting for school bus transportation is the relevant product market, we next address the question of what is the relevant geographic market. Mayflower argues that the relevant markets are Alaska, Washington and Oregon (the Pacific Northwest), and California. Laidlaw's position is that the entire United States should be considered the relevant market.

■ The proper issue is not merely where the respective parties do business or even where they compete, but where, within the area of competitive overlap, the effect of a merger on competition will be direct and immediate. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963). The relevant geographic market may be as large as the United States or as small as a single metropolitan area. *Brown Shoe*, 370 U.S. at 337, 82 S.Ct. at 1530; *see also Marathon Oil Co. v. Mobil Corp.*, 530 F.Supp. 315, 322–23 (N.D.Ohio) (and cases cited therein), *aff'd*, 669 F.2d 378 (6th Cir.1981), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982).

■ Actually, "Congress did not seem to be troubled about the exact spot where competition might be lessened; it simply intended to outlaw mergers which threatened competition in any or all parts of the country." *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549, 86 S.Ct. 1665, 1667, 16 L.Ed.2d 765 (1966). Establishing where the anticompetitive effect exists geographically is "entirely subsidiary to the crucial question in this and every § 7 case which is whether a merger may substantially lessen competition anywhere in the United States." *Id.* 384 U.S. at 550, 86 S.Ct. at 1668. Finally, § 7 prohibits an acquisition which merely eliminates a potentially significant entrant into a highly concentrated relevant market when the acquiring party is one of the few dominant or substantial competitors in that market. *Chemetron Corp. v. Crane Co.*, 1977–2 Trade Cas. (CCH) ¶ 61,717 (N.D.Ill.1977) (citing *United States v. Marine Bancorporation*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974)).

■ We find from the evidence that the relevant geographic markets are the Pacific Northwest, Alaska, and California. Alaska and the Pacific Northwest are geographically, or more precisely, demographically isolated. While this is self-evident as to Alaska, it is also true of the Pacific Northwest. In the latter area private contracting for school buses is concentrated in the western portion of Washington and Oregon, following the population centers of these states. It is obvious that these areas are those in which Mayflower and Laidlaw presently have their competitive overlap, and where the effect on competition of their merger would be direct and immediate.

As to California, it is clear that Mayflower is a likely significant entrant into that market, which is dominated by Laidlaw. Mayflower personnel have identified a "California Marketing Project," Defendant's Exhibit 28, attended school board and school superintendent conventions, obtained bid specifications, prepared brochures specifically geared to California, Defendant's Exhibit 29, and made general preparatory inquiries into that market. *See* Defendant's Exhibits 31–35. Mayflower's stated desire is to compete forthwith in the California market.

Having established the relevant markets, we next address whether the effect of Laidlaw's acquisition of Mayflower may be to substantially lessen competition in those markets. The Supreme Court has instructed that

intense congressional concern with the trend toward concentration warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects. Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963).

The combined market share of Laidlaw and Mayflower in the private contract school bus transportation business in Alaska is 76.2%. In the Pacific Northwest such combined share is a whopping 85.9%! Laidlaw's present share of the relevant California market is approximately 40%. In *Philadelphia Nat'l, supra,* the Supreme Court stated that "[w]ithout attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat." 374 U.S. at 364–65, 83 S.Ct. at 1742.

We find that a merger between Mayflower and Laidlaw would produce a firm controlling an undue share of the relevant markets, and would result in a significant increase in the concentration of firms in those markets. Therefore, we must enjoin Laidlaw's acquisition, unless we are presented with evidence clearly showing that the acquisition is not likely to lessen competition substantially. 374 U.S. at 363, 83 S.Ct. at 1741.

Laidlaw asserts that its acquisition of Mayflower—with the resulting increase in its market share and market domination—will not have the proscribed anticompetitive effect. It argues that entry into the market is so easy that it will be effectively constrained from unreasonably raising its prices because of the entry, or potential entry, of new competitors into the market. Because we find that there are, in fact, significant barriers to entry into the relevant markets, we are not persuaded by this argument.

One obvious and important barrier is the cost of insurance. Smaller, newer firms cannot absorb skyrocketing insurance premiums, if they can get insurance at all, and remain competitive in their bids. An example of this is the sad story of Transportation & Marketing Systems, Inc. (TMSI), as shown by the evidence. This company was started in 1982, and won a substantial contract in Anchorage, Alaska. In 1985, TMSI found itself unable to pay its vastly increased insurance premium and was forced to sell out to a larger company (Mayflower). Besides insurance costs, would-be entrants into the relevant markets are deterred by the length of the contracts (3–5 years normally), high capitalization costs, performance bond requirements, experience requirements, and other bid specification requirements.

Laidlaw has understandably tried to minimize the deterrent effect of these considerations. However, the record demonstrates that one of Laidlaw's successful marketing tactics is to encourage school boards to place experience requirements in bid specifications in order to freeze out new companies trying to enter the business. The same factors which deter new firms from entering the market can, and have, caused existing smaller firms to leave the market, as in the case of TMSI. Moreover, even if some small firms survive in an otherwise monopolized market, they may be quite content to follow the high prices set by the dominant firm, thus leaving the market effectively anticompetitive. *Philadelphia Nat'l,* 374 U.S. at 367 n.43, 83 S.Ct. at 1743 n.43.

We note that even if the relevant geographic market were defined as the entire United States, it is likely that Laidlaw's acquisition of Mayflower would be violative of the Clayton Act. Laidlaw is the largest private marketer and provider of contract operation bus service in the United States. Mayflower is the second largest. Together they account for approximately 10% of the American market. In *United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966), the Supreme Court held a merger between the tenth and eighteenth largest United States brewers, holding 4.49% of the national market share after the merger, to violate § 7 of the Clayton Act.

Laidlaw complied with 15 U.S.C. § 18a by filing its notification of intent to make a tender offer with the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice. It argues that the failure of either of these agencies to take adverse action on the antitrust question should be persuasive on this Court. We are not persuaded.

 The agencies' opinion of a merger is not binding on this Court, and their enforcement decisions do not necessarily reflect the current state of antitrust law. *See, United States v. American Cyanamid Co.*, 719 F.2d 558 (2d Cir.1983), *cert. denied*, 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984); *Chrysler Corp. v. General Motors Corp.*, 589 F.Supp. 1182 (D.D.C.1984); *Monfort of Colorado, Inc. v. Cargill, Inc.*, 591 F.Supp. 683 (D.Colo.1983), *aff'd*, 761 F.2d 570 (10th Cir.1985) *cert. granted*, —— U.S. ——, 106 S.Ct. 784, 88 L.Ed.2d 763 (1986) (the guidelines "are primarily a statement of ... enforcement intentions" and "a tool to assist Justice Department attorneys in determining which mergers to challenge"; they "do not represent legal precedent to determine illegality." *Id.* In affirming, the Tenth Circuit stated that the Department of Justice "guidelines are more useful for setting prosecutorial policy than delineating judicial standards." 761 F.2d at 579.)

However, perhaps the best response to the argument that the Attorney General, rather than the Supreme Court, is the final authority on the meaning of the antitrust laws, is set out in the appendix to the concurring opinion of Mr. Justice Douglas in *Pabst*, 384 U.S. at 553, 86 S.Ct. at 1669. We suggest that it should be required reading for every judge who wants to put his own gloss on the simple language of § 7.

 We find that Mayflower has a strong likelihood of succeeding on its § 7 Clayton Act claim against Laidlaw.

 Because we have so found, the balance of harm need weigh less in favor of Mayflower than if Mayflower's likelihood of success on the merits was less strong. *Roland*, 749 F.2d at 387. Nevertheless, we find that the balance of harm weighs significantly in Mayflower's favor. We have already discussed the harm which will result to Mayflower if injunctive relief is denied. Neither Laidlaw, nor the shareholders of Mayflower, are entitled to any gain obtained from a sale that presents a substantial likelihood of violating the Clayton Act. *Grumman*, 665 F.2d at 16.

 The fourth and last criterion to be considered in granting or denying a preliminary injunction is the impact, if any, which the decision will have on the public interest. *Roland, supra*.

We find that the public interest weighs heavily in favor of granting injunctive relief to Mayflower. There is an overriding public interest in the preservation of competition. *See, e.g., Harnischfeger, supra; Chemetron, supra; see also United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir.1980) (once it has been demonstrated that a reasonable probability exists that § 7 will be violated, irreparable harm to the public should be presumed).

 Injunctive relief to prevent a violation of the Clayton Act is appropriate when an acquisition will have the specified anticompetitive effect "in any line of commerce, whether or not that line of commerce is a large part of the business of any of the corporations involved in the acquisi-

tion." *Chemetron, supra* (quoting S.Rep. No. 1775, 81st Cong., 2d Sess. 5 (1950)). Moreover, a merger may be enjoined as violative of the Clayton Act even though the corporations involved do not compete in every geographic market in which either operates. *Cf. Brown Shoe,* 370 U.S. at 337, 82 S.Ct. at 1530. Any limitation on the injunctive relief to be granted would be particularly inappropriate in this case given that, as discussed above, Laidlaw's acquisition of Mayflower could very well constitute a violation of the Clayton Act, not just in Alaska, the Pacific Northwest, and California but on a nationwide scale as well.

Finally, we come to the matter of the appropriate bond to be posted by Mayflower, pursuant to Rule 65(c), Federal Rules of Civil Procedure. Laidlaw, although arguing that it should not be required to post bond if successful on its own motion for a preliminary injunction, suggests that Mayflower, if successful, should be required to post bond in the sum of at least $725,000,-000—a sum more than three times the amount of Laidlaw's tender offer. We do not find this suggestion helpful. In the absence of any evidence, or further suggestion, bond is hereby fixed in the sum of $250,000.00.

A preliminary injunction will issue in accordance herewith.