**MARATHON OIL COMPANY, Plaintiff,**

v.

**MOBIL CORPORATION, etc., et al., Defendants.**

**No. C81–2193.**

United States District Court,
N. D. Ohio, E. D.

Nov. 1, 1981.

Patrick F. McCartan, Richard W. Pogue, Carl L. Steinhouse, John L. Strauch, Cleveland, Ohio, Donald I. Baker, William E.

Swope, Washington, D. C., Robert J. Hoerner, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Michael W. Mitchell, Rodney O. Thorson, Stuart L. Shapiro, John M. Nannes, Skadden, Arps, Slate, Meagher & Flom, New York City and Washington, D. C., for plaintiff.

Charles F. Clarke, James P. Murphy, Eben G. Crawford, John E. Lynch, Squire, Sanders & Dempsey, Cleveland, Ohio, Sanford M. Litvack, Donovan, Leisure, Newton & Irvine, New York City, Howrey & Simon, Washington, D. C., for Mobil Corp. and Mobil Oil Corp.

Richard Cusick, John D. Leech, Calfee, Halter & Griswold, Cleveland, Ohio, John L. Warden, Sullivan & Cromwell, New York City, for Merrill Lynch, Pierce, Fenner & Smith, Inc.

## MEMORANDUM OF OPINION AND ORDER

MANOS, District Judge.

On November 1, 1981 plaintiff, Marathon Oil Company, (hereinafter Marathon), filed the above-captioned case under Section 16 of the Clayton Act, 15 U.S.C. § 26, to enjoin the proposed acquisition of Marathon by the defendant, Mobil Corporation, (hereinafter Mobil), on the ground that a merger of the two companies would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.[1] The case is currently before this court on Marathon's motion for a preliminary injunction. On the motion the parties primarily rely on affidavits, on statistical data and on facts developed at an evidentiary hearing.

Marathon is an Ohio corporation with its principal place of business in Findlay, Ohio. Mobil is a Delaware corporation with its principal place of business in New York, New York. The defendant, Mobil Oil Corporation, (hereinafter referred to collectively as Mobil), is a New York corporation with its principal place of business is New York, New York. Both Marathon and Mobil are large integrated petroleum companies and are among the seventeen major integrated petroleum companies in the United States.

Mobil has total assets of 32.7 billion dollars. In 1980 it had total revenues of 63.7 billion dollars and net income of 3.27 billion dollars[2] making it the second largest industrial company in the United States ranked by sales. Mobil has domestic crude oil reserves of 759 million barrels and domestic natural gas reserves of 5,754 billion cubic feet. It operates six (6) refineries in this country with a combined capacity of 859,700 barrels per day and ranks seventh among domestic refiners. In 1980 Mobil sold 6.55 billion gallons of motor gasoline which accounted for 6.3 percent of total domestic sales and ranked fourth among domestic sellers. Mobil owns the largest number of crude oil gathering pipelines in the United States and ranks second in the United States in total domestic crude oil pipeline mileage. In 1980 Mobil ranked fourteenth in the United States in the amount of refined petroleum products delivered over wholly owned domestic product pipelines. Mobil owns and operates over one hundred (100) petroleum terminals in the United States.

Marathon has total assets of 5 billion dollars. In 1980 it had total revenues of 8.75 billion dollars and net income of 379 million dollars making it the thirty-ninth largest industrial company in the United States. Marathon has domestic crude reserves of 644 million barrels and domestic natural gas reserves of 1.644 billion cubic

---

1. 15 U.S.C. § 18 provides in pertinent part:
   No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

2. The net income figure includes an extraordinary gain net of tax realized from the sale of Mobil's interest in the Belridge Oil Company.

feet. It operates four (4) refineries in this country with a combined capacity of 588,000 barrels per day and ranks ninth among domestic refiners. In 1980 Marathon sold 3.83 billion gallons of motor gasoline which accounted for 3.7 percent of total domestic sales and ranked twelfth among domestic sellers. Marathon wholly owns approximately 2600 miles of crude oil pipelines and 1400 miles of refined products pipelines in the United States. It possesses a joint ownership interest in an additional 2000 miles of crude oil pipelines and 1700 miles of refined products pipelines. In 1980 Marathon ranked fifth in the United States in the amount of refined petroleum products delivered over wholly owned domestic product pipelines. Marathon owns and operates forty-nine (49) petroleum terminals in the United States.

Mobil markets motor gasoline on a nationwide basis primarily through Mobil brand outlets. Marathon, on the other hand, markets motor gasoline in a twenty-one (21) state area. Approximately, 15 percent of Marathon's total gasoline sales are made to independent branded jobbers, branded distributors and branded dealers in the states of Illinois, Indiana, Kentucky, Michigan, Ohio and Wisconsin. This gasoline is eventually resold at retail under the Marathon brand. The remaining 85 percent of Marathon's gasoline sales are made by its Wholesale Marketing Division at a terminal rack price or tankwagon price. All such sales are unbranded and are made in the following estimated quantities to the following three (3) categories of customers:

(1) 10 percent of Marathon's gasoline sales are made to seven (7) companies in which Marathon owns a minimum 50 percent equity interest; (2) 25 percent of Marathon's total gasoline sales are made to the Emro Marketing Company, a wholly owned subsidiary of Marathon which resells at retail under the Gastown, Speedway, Bonded and Consolidated brands; and (3) 50 percent of Marathon's total gasoline sales are made to over 1100 independent businesses which resell either at wholesale or retail prices. Approximately 60 percent of all gasoline sold by Marathon is eventually resold at retail prices that are generally several cents per gallon below that sold in Mobil branded outlets. Mobil admits that its proposed acquisition of Marathon would make Mobil the largest marketer of motor gasoline in the United States with almost 10 percent of the national market.

Marathon alleges in its complaint that, in violation of Section 7 of the Clayton Act, the effect of the proposed acquisition may be to substantially lessen competition in the: exploration and production of crude oil; refining of crude oil; transportation of crude oil and refined petroleum products; and marketing of refined petroleum products, including motor gasoline, in certain regional,[3] state[4] and local[5] markets. The complaint further alleges that the effect of the proposed acquisition may be to substantially lessen competition because Marathon would be eliminated as a major supplier of gasoline to independent marketers. In response to Marathon's allegations, Mobil asserts that the relevant geographic market is

3. In 1950, the Petroleum Administration for Defense established five (5) Petroleum Allocation for Defense Districts, commonly known as "PADs," for the purpose of reflecting geographic regions of the petroleum industry considered natural in character. The PADs are numbered I–V. PAD I includes all states bordering on the Atlantic Ocean as well as Pennsylvania, West Virginia and Vermont. PAD II includes the states of Ohio, Indiana, Kentucky, Tennessee, Michigan, Wisconsin, Illinois, Missouri, Iowa, Minnesota, Oklahoma, Kansas, Nebraska, South Dakota and North Dakota. PAD III includes the states of Alabama, Mississippi, Arkansas, Louisiana, Texas and New Mexico. PADs IV and V include the remaining western

and northwestern states. Marathon alleges that the effect of the proposed acquisition may be to substantially lessen competition in PADs II and III individually and in PADs II and III combined.

4. The states of primary concern are: Illinois, Indiana, Michigan, Ohio, Tennessee, Wisconsin and Florida or a combination thereof.

5. Marathon has submitted to the court a study of motor gasoline sales and market shares of both Mobil and Marathon for thirty-six (36) standard Metropolitan Statistical Areas, commonly known as SMSAs, located in Illinois, Indiana, Ohio, Michigan and Wisconsin.

nationwide and that, when so viewed, the effect of the proposed acquisition will not be to substantially lessen competition since the increase in concentration in the petroleum industry resulting from the acquisition would be de minimus. Mobil also argues that it would continue the supply of gasoline to independent marketers because of the tremendous refining capacity that it would have upon the acquisition of Marathon. Therefore, the proposed acquisition would not have an adverse effect on competition.

The United States Supreme Court has established the basic standards to be applied by the courts in suits brought under Section 7 of the Clayton Act in a series of cases beginning with *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), and following with such cases as *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); *United States v. Aluminum Co. of America*, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); *United States v. Continental Can Co.*, 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966); and *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974).

█ In construing the legislative history of Section 7 of the Clayton Act as amended, the United States Supreme Court in *Brown Shoe*, reasoned that:

The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy. . . .

370 U.S. at 315, 82 S.Ct. 1502. Clearly, the greater the degree of concentration in a particular industry, "the greater is the likelihood that parallel policies of mutual advantage, not competition, will emerge." *United States v. Aluminum Co. of America*, 377 U.S. 271, 280, 84 S.Ct. 1283, 1289, 12 L.Ed.2d 314 (1964). *See also: United States v. Philadelphia National Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 1742, 10 L.Ed.2d 915 (1963); *United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1231 (C.D.Calif.1973), aff'd., 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974). "It is the basic premise of [Section 7] that competition will be most vital when there are many sellers; none of which has any significant market share." *United States v. Aluminum Co. of America, supra*, 377 U.S. at 280, 84 S.Ct. at 1289. Thus, although a vast amount of scholarly literature has been published regarding Section 7 of the Clayton Act, its interpretation is not difficult. Section 7 merely proscribes mergers which lessen competition in any line of commerce in any section of the country. As established in *Brown Shoe*, the section does not prohibit all mergers. What Congress intended in enacting Section 7 was to arrest restraints of trade and/or monopolistic tendencies "in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding." [6] *See: United States v. Atlantic Richfield Co.*, 297 F.Supp. 1061 (S.D.N.Y.1969), aff'd. sub nom., *Bartlett v. United States*, 401 U.S. 986, 91 S.Ct. 1233, 28 L.Ed.2d 527 (1971).

█ Although Section 7 of the Clayton Act is concerned with the proscription of mergers that may have substantial anti-competitive effects, it is neither directed at the possibility that anti-competitive effects might occur, nor at the certainty of such effects. In *United States v. E. I. Du Pont de Nemours & Co.*, 353 U.S. 586, 598, 77 S.Ct. 872, 880, 1 L.Ed.2d 1057 (1957), the United States Supreme Court held that

---

**6.** S.Rep.No.1775, 81st Cong., 2d Sess., pp. 4–5 (1950), U.S.Code Congressional Service 1950, p. 4293.

"proof of a mere *possibility* of a prohibited restraint or tendency to monopoly will not establish the statutory requirement that the effect of an acquisition 'may be' such restraint or tendency . . ." (emphasis supplied). Section 7 only "concerns itself with the reasonable probability of the lessening of competition or tendency toward monopoly as a result of the particular merger being scrutinized—a showing that such effects are reasonably likely to occur." *United States v. Atlantic Richfield Co.,* supra, 297 F.Supp. at 1066. As succinctly reasoned by the *Atlantic Richfield* court:

> Thus, mergers are proscribed where substantial anti-competitive effects or tendency to monopoly are reasonably probable in *any* line of commerce in *any* section of the country. In order to determine whether there are substantial anti-competitive effects or tendency to monopoly, it is necessary in each case to define the relevant product market in which it is claimed that such effects will occur, and the section or sections of the country affected. The probability of anti-competitive effects and their substantiality cannot be evaluated in a vacuum. They can only be judged in terms of the particular markets affected, that is, "within the area of effective competition." (Emphasis supplied). (Footnote omitted).

*Id.*

■ For the purposes of the preliminary injunction, no dispute exists between the parties about motor gasoline being the relevant product market.[7] The crucial question presented is whether the relevant geographic market is nationwide or something less. Of course, upon determining the relevant geographic market, the court must decide whether the effect of the proposed acquisition may be to substantially lessen competition in the sale of motor gasoline within the outer boundaries of that particular geographic market. In any event, this case is before the court on Marathon's motion for a preliminary injunction, not on the ultimate merits of any of the substantive issues. The court must merely decide whether the moving party has shown a likelihood of success on the merits of the case, that it will suffer irreparable harm if a preliminary injunction is not issued, that a preliminary injunction is in the public interest and that the moving party has no adequate remedy at law. *See generally: United States v. Atlantic Richfield Co.,* supra; *Muskegon Piston Ring Co. v. Gulf & Western Industries, Inc.,* 328 F.2d 830 (6th Cir. 1964).

In examining the criteria in the inverse order in which they are listed above the court finds that Marathon, would have no adequate remedy at law if the acquisition was subsequently found to violate Section 7 of the Clayton Act because no satisfactory method exists that would restore Marathon to its present competitive position in the marketplace. The disruption of a business the size of Marathon cannot be ignored even in light of the remedy of divestiture. Similarly, the mere possibility that Marathon would be eliminated as an effective competitor from the marketplace is sufficient to satisfy the public interest criterion. If the acquisition of Marathon by Mobil was subsequently found to violate Section 7 of the Clayton Act, it, of necessity, would be to substantially lessen competition. Since a lessening of competition in nearly any area of the economy is detrimental to the public, Marathon has satisfied the public interest criterion.

The determination of irreparable harm, like the determination of the first two criteria, is not difficult to make. A basic goal of a preliminary injunction in a case such as this is the maintenance of the status quo to assure that the firm which is the target of the proposed acquisition will remain a viable, independent, competitive entity if it ultimately prevails on the merits. If preliminary injunctive relief is not available to a firm such as Marathon, an acquiring firm such as Mobil could irreparably alter the competitive position of Marathon prior to

---

7. Although the parties do dispute whether other distinct product markets exist, (e.g., termi-

nalling services), resolution of such issues is not necessary at this stage of the proceedings.

divestiture by terminating business relationships with its customers, learning and/or disclosing confidential trade secrets or research efforts and/or discharging or permanently dislocating employees. Accordingly, Marathon has satisfied the irreparable harm standard. It is to the final criterion, the likelihood of success on the merits of the case—an assessment which suffuses the other factors requisite to a preliminary injunction—to which the court shall now focus its attention.

As noted above the crucial question presented for resolution is whether the relevant geographic market is nationwide or something less. Mobil asserts that the relevant geographic market for measuring the effect on competition of its proposed acquisition of Marathon is the continental United States or, at the very least, the region east of the Rocky Mountain chain including every state within which Marathon does business. Mobil's premise is that prices of motor gasoline tend toward uniformity [8] nationwide and that because of the pressures of demand and supply, the relevant geographic market for measuring the competitive impact of acquiring Marathon is not simply the geographic regions in which both Mobil and Marathon do business. Stated otherwise, if prices within different parts of the continental United States, tend toward uniformity, these precise geographic areas constitute a single market since changes in the price of the product in one area will affect prices in another area. Mobil further asserts that such a pricing analysis is unaffected by random pricing disparities in particular areas because such disparities at certain points in time provide an insufficient base upon which to conduct an examination. Mobil reasons what is crucial is that prices tend toward uniformity over time.

Another reason Mobil offers as support for its contention that the relevant geographic market is nationwide is that there are substantial flows of refined products, including motor gasoline, and crude oil throughout vast regions of the United States. Mobil asserts that when the nation's crude oil and refined product transportation modes are examined the conclusion is inescapable that the relevant geographic market is nationwide for two reasons: first, there is substantial "exporting" of motor gasoline from PAD III into PADs I and II; and second, there are significant imbalances existing between refinery production and consumption of motor gasoline in all of the states which comprise each PAD district.

An additional factor which Mobil claims establishes a relevant geographic market nationwide is the testimony of independent marketers of motor gasoline who buy motor gasoline from the cheapest source of supply available notwithstanding the distances that exist between points of supply and points of resale. In constructing this argument Mobil relies heavily on the testimony of one of its witnesses, an independent marketer of motor gasoline in both the Pittsburgh, Pennsylvania and Savannah, Georgia areas, who related that he had frequently purchased motor gasoline from locations as distant from his retail outlets as New York, New York and Houston, Texas.[9]

Other than *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), the major cases construing the scope and effect of Section 7 of the

---

**8.** Price uniformity is defined as price equality. Mobil asserts that the price of motor gasoline, with due allowance for transportation costs, tends toward uniformity nationwide.

**9.** A great number of such purchases are facilitated in the petroleum industry generally through the use of what is commonly referred to as an exchange agreement. An exchange agreement is an agreement by which one company's refined petroleum products are exchanged with those of another company at widely disparate locations. Theoretically, on the supply side, exchange agreements afford a means for a producer of motor gasoline to enter and compete for sales in geographic areas where that producer possesses no physical distribution facilities. On the demand side, exchange agreements provide purchasers with wide geographic areas from which to secure supplies of motor gasoline. When questioned regarding the frequency of industry use of exchange agreements, Marathon's expert witness replied that they numbered in the "zillions."

Clayton Act were decided by the United States Supreme Court in the nineteen-sixties. Since that time the petroleum industry has been radically changed by over a decade of rigid domestic price and supply controls and by the influence of the uncertainty of foreign sources of crude oil. These changes may reflect the need to re-evaluate the rationale upon which the prior decisions were premised in so far as the petroleum industry is concerned.

However, evaluating Mobil's contention, first from the standpoint of practicalities, reveals that as a general rule, due to increased transportation costs, retailers of motor gasoline do not acquire their refined product in geographic areas of the nation which are remote to their places of business.[10] Similarly, at the gasoline pump, consumers do not customarily journey out of a locality to purchase motor gasoline. Such facts tend to show that the relevant geographic market for motor gasoline is something less than nationwide.

Second, although the empirical evidence indicates that over time the price of motor gasoline tends toward uniformity, it does not indicate conclusively the reasons for the existence of price differentials in various local geographic regions throughout the nation. There is little doubt that price differentials do exist over time [11] and that their magnitude is significant when compared to a petroleum company's profits. The persistence of price differentials in various areas of the nation demonstrates that motor gasoline does not move from area to area in response to price changes easily or as readily as Mobil asserts. Rather, they indicate that the relevant geographic market for motor gasoline is something less than nationwide. Clearly, such an analysis must be more fully developed at a trial on the merits.

Historically, the "any section of the country" phrase contained in Section 7 of the Clayton Act has been defined as any geographic market or submarket in which an adverse competitive effect may result from an acquisition. *See: Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In *United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966), the United States Supreme Court elaborated on this definition as follows:

> Congress did not seem to be troubled about the exact spot where competition might be lessened; it simply intended to outlaw mergers which threatened competition in any or all parts of the country. Proof of the section of the country where the anticompetitive effect exists is entirely subsidiary to the crucial question in this and every § 7 case which is whether a merger may substantially lessen competition anywhere in the United States.

384 U.S. at 549, 550, 86 S.Ct. at 1668. In *United States v. Philadelphia National Bank*, 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963), the Court held that, in the context of the case before it, "the proper question to be asked ... is not where the parties to the merger do business or even where they compete, but where within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." As a general rule, however, "any section of the country" does encompass "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961). The relevant geographic market can be as large as the United States or as small as a single metropolitan area. *See: United States v. E. I. Du Pont de Nemours*

---

10. The evidence submitted regarding exchange agreements is simply inconclusive when considered for the purpose of establishing a relevant geographic market that is nationwide. Although testimony established that the practice of entering such agreements is pervasive, it also established that such agreements are inherently unreliable when considered as a sub-

stitute for a long term source of supply. Indeed, Mobil itself has withdrawn from certain areas where it had relied solely on exchange agreements rather than its own terminal and distribution system.

11. Depending, of course, on the geographic region examined.

*& Co.*, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), (United States); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966), (United States, Wisconsin, Illinois and Michigan combined and Wisconsin alone); *United States v. Atlantic Richfield Co.*, 297 F.Supp. 1061 (S.D.N.Y.1969), *aff'd. sub nom., Bartlett v. United States*, 401 U.S. 986, 91 S.Ct. 1233, 28 L.Ed.2d 527 (1971), (Virginia, North Carolina, South Carolina, Georgia and Florida); *United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226 (C.D.Calif.1973); *aff'd.*, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974), (California); *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), (Philadelphia); *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), (Los Angeles).

The only decision rendered by the United States Supreme Court which differed somewhat from the precedents listed above is *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). In *General Dynamics*, the Court held lawful a merger among firms producing coal in Illinois and some surrounding areas although the merger raised the concentration of production in that region from 43 percent to 63 percent in the top four (4) firms. The Court's decision was premised on two grounds. First, the relevant geographic market was held to be much broader than that alleged by the United States Department of Justice. Second, the Court held that the district court properly considered certain factors which peculiarly affected the coal industry as a whole as well as the structure of the two corporations at issue, including the lack of adequate coal reserves of the acquired corporation, in reaching its conclusion that the merger was one which would not substantially lessen competition.[12]

In six (6) states [13] in the midwestern United States and eastern portion of PAD II, Mobil and Marathon are substantial marketers of motor gasoline. In 1980 Mobil's sales accounted for 4.97 percent of all sales in Illinois, 2.55 percent of all sales in Indiana, 7.69 percent of all sales in Michigan, 2.75 percent of all sales in Ohio, 4.49 percent of all sales in Tennessee and 8.15 percent of all sales in Wisconsin. Marathon's sales accounted for 12.84 percent of all sales in Illinois, 14.59 percent of all sales in Indiana, 12.75 percent of all sales in Michigan, 13.95 percent of all sales in Ohio, 5.95 percent of all sales in Tennessee, and 9.29 percent of all sales in Wisconsin. During this period Mobil's total sales ranked fifth in Illinois, ninth in Indiana, fourth in Michigan, ninth in Ohio, tenth in Tennessee and third in Wisconsin while Marathon's total sales ranked second in Illinois, second in Indiana, second in Michigan, second in Ohio, sixth in Tennessee and second in Wisconsin. A combined Mobil-Marathon would lead to the following sales percentages and rankings: 17.80 percent of all sales in Illinois, second; 17.13 percent of all sales in Indiana, first; 20.44 percent of all sales in Michigan, first; 16.70 percent of all sales in Ohio, second; 10.44 percent of all sales in Tennessee, second; and 17.44 percent of all sales in Wisconsin, first.[14] In the states analyzed, a combined Mobil-Marathon would change the four-firm concentration ratios [15] in the following manner:

from 48 percent to 53 percent of all sales in Illinois; from 47.1 percent to 49.6 percent of all sales in Indiana; from 45.2 percent to 51.5 percent of all sales in Michigan; from 53 percent to 55.8 percent of all sales in Ohio; from 40.4 percent to 44 percent of all

---

**12.** With regard to geographic markets, commentators have observed that the *General Dynamics* holding "loosened the precedent that 'any' significant market would show a violation." W. Shepherd & C. Wilcox, Public Policies Toward Business 178 (6th ed. 1979).

**13.** Illinois, Indiana, Michigan, Ohio, Tennessee and Wisconsin.

**14.** Rounded figures.

**15.** Accepted measures of concentration in a particular industry include the four-and eight-firm concentration ratios which measure the market shares held by the top four and eight firms in a market and the Herfindahl Index which is the sum of the squared market shares of all firms in a market.

sales in Tennessee; and from 38.1 percent to 43.5 percent of all sales in Wisconsin.

In *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Government brought an action to enjoin the proposed merger of Brown Shoe Company and G. R. Kinney Company, Inc., on the ground that the proposed merger would violate Section 7 of the Clayton Act. The horizontal aspects of the proposed merger focused upon the retail outlets of the two competing companies. The relevant geographic market was determined to be cities with populations in excess of 10,000. The relevant lines of commerce were determined to be men's, women's and children's shoes. In one hundred and eighteen (118) of the cities surveyed the combined market share of the two companies was found to exceed 5 percent. Indeed, in some of the cities the combined market share was found to be as high as 57 percent. Although the retail shoe market was found to be rather fragmented, the Government produced evidence establishing increasing trends toward concentration. The United States Supreme Court held the merger to be a violation of Section 7 of the Clayton Act:

> The market share which companies may control by merging is one of the most important factors to be considered when determining the probable effects of the combination on effective competition in the relevant market. If a merger achieving 5% control were now approved, we might be required to approve future merger efforts by Brown's competitors seeking similar market shares. The oligopoly Congress sought to avoid would then be furthered and it would be difficult to dissolve the combinations previously approved. (Footnotes omitted).

370 U.S. at 343–344, 82 S.Ct. at 1534. The Court found the industry trend toward concentration particularly relevant, emphasizing "[w]e cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency, particularly when those tendencies are being accelerated through giant steps striding across a hundred cities at a 'time." *Id.* at 346, 82 S.Ct. at 1535.

In one of the last major horizontal merger cases to be decided by the United States Supreme Court, *United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966), the Government challenged the acquisition by Pabst Brewing Company of the Blatz Brewing Company. In 1958 Blatz was the eighteenth largest brewer of beer in the United States while Pabst was the tenth largest brewer. Combined the two companies ranked fifth with 4.49 percent of the beer industry's total national sales. In Wisconsin, before the merger, Blatz and Pabst ranked fourth and first respectively. After the merger Pabst ranked first with 23.95 percent of that market. In the three state area of Wisconsin, Illinois and Michigan, Blatz and Pabst ranked sixth and seventh respectively. Combined their sales accounted for 11.32 percent of the total sales in that three state market. At that point in time, the brewing industry had experienced a pronounced trend toward concentration. Nationally, the ten (10) leading brewers accounted for 52.6 percent of all sales in 1961 while in 1957 they had accounted for a smaller but substantial 45.06 percent. In Wisconsin, Illinois and Michigan the market share of the eight leading brewers had increased from 58.93 percent to 67.65 percent during the same period of time. In Wisconsin alone in 1961, the four largest brewers accounted for 58.62 percent of the market. Placing primary reliance on the market shares of the two companies and the increasing trend toward concentration in the industry the Court found the merger to be a violation of Section 7 of the Clayton Act in "each and all" of the three geographic regions analyzed, i.e., in the United States as a whole, in the three state area of Wisconsin, Illinois and Michigan and in the state of Wisconsin alone.

In *United States v. Atlantic Richefield Co.*, 297 F.Supp. 1061 (S.D.N.Y.1969), *aff'd. sub nom., Bartlett v. United States*, 401 U.S. 986, 91 S.Ct. 1233, 28 L.Ed.2d 527 (1971), the Government challenged the merger of the Atlantic Richfield Company and the Sinclair Oil Company. Both Atlan-

tic and Sinclair were large integrated petroleum companies and at the time ranked among the nineteen major integrated oil companies in the United States. The relevant line of commerce was determined to be the marketing of motor gasoline and the relevant geographic market was determined to be the five state area of Virginia, North Carolina, South Carolina, Georgia and Florida where the two companies were substantial competitors. In the first nine months of 1968 Atlantic's sales accounted for 2.3 percent of this market while Sinclair's sales accounted for 5.1 percent. Combined, therefore, the sales of Atlantic and Sinclair accounted for 7.4 percent of all sales in the southeastern United States. During the period analyzed Atlantic and Sinclair ranked twelfth and ninth respectively in total sales and combined their ranking would have been sixth. After finding that substantial barriers to entry existed in the petroleum industry and that the industry had experienced a recent wave of mergers tending to increase industry concentration, the district court found that the Government had established a reasonable probability that it would succeed at trial on the issue of probable substantial lessening of competition in the southeast as a result of the proposed merger and granted its motion for a preliminary injunction. This decision was subsequently affirmed without opinion by the United States Supreme Court.

Similarly, in *United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226 (C.D.Calif. 1973), aff'd., 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974), the Government challenged the acquisition by the Phillips Petroleum Company of the Tidewater Oil Company. At the time the complaint was filed, Phillips and Tidewater each engaged in the acquisition of oil and natural gas lands, the production of crude oil and natural gas, the manufacture of refined petroleum products and the transportation and marketing of crude oil and refined petroleum products. The parties stipulated that for the purpose of Section 7 of the Clayton Act the relevant line of commerce was the sale of motor gasoline and that the relevant geographic market was the state of California. At the time of the acquisition Phillips was not selling motor gasoline in California. Tidewater, however, accounted for approximately 6 to 7 percent of total sales in California. Although the district court found that the barriers to entry in the petroleum industry were substantial, it held that Phillips possessed the capability to enter the California market without acquiring Tidewater. Concluding that the industry was already highly concentrated, the district court found the effect of the acquisition may be to substantially lessen competition and, therefore, in violation of Section 7 of the Clayton Act. This decision was subsequently affirmed without opinion by the United States Supreme Court.

■ The decisions analyzed above clearly provide that important factors to consider when determining the impact on competition of a proposed merger include the market shares of the merging firms, industry trends toward concentration, the degree of concentration within the industry, the history of acquisition of the merging firms and the barriers to entry in the industry. Of course, this list is by no means exclusive. Other factors, depending on their relevancy, may be considered as well. For example, the United States Department of Justice has published "Merger Guidelines." As noted by the district court in *Atlantic Richfield, supra*:

> The purpose of the Guidelines is to insure that the business community, the legal profession and other interested persons are informed of the Department's policy of enforcing Section 7 of the Clayton Act. However, they are in no way binding on the Department in a particular case and the Department is entitled to evaluate each case on the basis of its own facts and the varied factors that must be taken into consideration. (Citations omitted). (Footnote omitted).

297 F.Supp. at 1073. Obviously, such guidelines are not binding on the courts.

It is unquestioned that the petroleum industry is highly concentrated and that it is characterized by substantial barriers to en-

try. In this regard the court agrees with the following analysis made by the district court in *Atlantic Richfield, supra*:

> The nature and size of gasoline marketing operations are such that enormous expenditures of capital would be necessary to enter the market as a viable competitor. Such costs are almost prohibitive.
>
> In view of the high entry barriers, any increase in concentration and decrease in number of competitors by way of merger would be likely to become permanent. Moreover, the absence of potential new entrants into the market, who usually tend to restrain anti-competitive tendencies, enhances any anti-competitive effects which this merger may have. (Footnote omitted).

*Id.* at 1072.

In all cases which this court has examined the United States Supreme Court has held illegal the consolidation of two vibrant and highly competitive industrial firms, each of which has a substantial share of a significant market. There is little doubt that the combined market shares of Mobil and Marathon in the states of Illinois, Indiana, Michigan, Ohio, Tennessee and Wisconsin would approach or surpass those found to constitute Section 7 violations in *Brown Shoe* and *Pabst*. Accordingly, at this stage of the proceedings, this court holds that Marathon has shown a reasonable probability that it will succeed at trial on the merits of the issue of probable substantial lessening of competition in the states of Illinois, Indiana, Michigan, Ohio, Tennessee and Wisconsin as a result of the proposed merger. Therefore Marathon's motion for a preliminary injunction restraining Mobil from carrying out the proposed acquisition is granted.

IT IS SO ORDERED.