**MARATHON OIL COMPANY,**
**Plaintiff-Appellee**

v.

**MOBIL CORPORATION; Mobil Oil Corporation; Merrill Lynch, Pierce, Fenner & Smith Incorporated, Defendants-Appellants**

Nos. 81–3704, 81–3713.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 17, 1981.

Decided Dec. 23, 1981.

Certiorari Denied Feb. 22, 1982.
See 102 S.Ct. 1490.

Charles F. Clarke, James P. Murphy, Eben G. Crawford, John E. Lynch, Jr., Squire, Sanders & Dempsey, Cleveland, Ohio, Sanford M. Litvack, Donovan, Leisure, Newton & Irvine, New York City, Richard Cusick, John D. Leech, Calfee, Halter & Griswold, Cleveland, Ohio, John L. Warden, Gandolfo V. DiBlasi, Sullivan & Cromwell, New York City, Howrey & Simon, Washington, D.C., for defendants-appellants.

Patrick F. McCartan, Richard Pogue, Jones, Day, Reavis & Pogue, John L. Strauch, Donald I. Baker, Washington, D. C., Michael W. Mitchell, Rodney O. Thorson, John M. Nannes, Stuart L. Shapiro, Skadden, Arps, Slate, Meagher & Flom, New York City, Murray S. Monroe, Taft, Stettinius & Hollister, Cincinnati, Ohio, for plaintiff-appellee.

Before EDWARDS, Chief Judge, and ENGEL and MERRITT, Circuit Judges.

MERRITT, Circuit Judge.

Section 7 of the Clayton Act, 15 U.S.C. § 18, provides that "no person . . . shall acquire . . . stock . . . where in any line of commerce . . . in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." In this suit for injunctive relief under section 7, we review on an expedited basis a preliminary injunction issued November 30, 1981, by District Judge Manos blocking the proposed acquisition of Marathon Oil Company by Mobil Corporation announced October 30, 1981. We have considered the extensive briefs of the parties and the Joint Appendix consisting of detailed statistical and financial information describing the oil industry and concentration ratios in the exploration, production, transportation, refining, terminal and retail phases of the industry, as well as affidavits and testimony of the economic experts of the parties, Mr. Scherer (Marathon) and Mr. Stigler (Mobil), and numerous officers and agents of the two companies. On December 17, 1981, the Court heard arguments of counsel. Based upon consideration of the case, we conclude that District Judge Manos did not err in issuing the preliminary injunction under section 7 prohibiting the takeover.

In *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court set out a number of factors to be considered in interpreting the standard of liability established in section 7 of the Clayton Act in a horizontal merger case, including the following: "the relative size and number of the parties to the arrangement"; the "relevant market"; "the market shares which companies may control by merging"; "the history of tendency toward concentration in the industry"; "mitigating factors" demonstrating a "need for combination." Other cases like *United States v. E.I. DuPont de Nemours & Co.,* 351

U.S. 377, 394, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956), have added consideration of " 'cross-elasticity' of demand in the trade" as a consideration and "barriers to new entry," *Federal Trade Comm'n v. Proctor & Gamble Co.*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967).

■ Our conclusion that the District Court was correct in finding likelihood of success on the merits is based on a consideration of the following factors: (1) the size of the industry in comparison to the size of the economy of the nation; (2) concentration ratios in various lines and phases of the industry, particularly motor gasoline, and in various geographical markets of the industry; (3) the elasticity of the demand for petroleum and gasoline and the effect of this elasticity on the market power of the major oil companies, given their market shares; (4) barriers to the entry of new participants in the industry; (5) the conduct of members of the industry respecting joint ventures and exchange agreements at the exploration, production, transportation, refining and marketing stages of the industry; and (6) the possibility of increased economic efficiency and other benefits that could arise from the consummation of the merger.

### 1. *Size*

The size of the oil industry and the firms involved in it in relation to the overall economy is a factor to be considered. But it is only one factor to be considered in relationship to others. An industry and the firms within it may be very large and still be very competitive. Size becomes important for antitrust purposes when firms within an industry appear to possess market power or the power to raise prices above or restrict output below levels that would occur in a competitive marketplace. To the extent that an industry is not fully competitive, its large dollar size simply increases the dollar loss of the consumers who must pay higher prices.

Of the largest 20 industrial companies in the country, 13 are oil companies. Exxon is the largest industrial company in the nation and in the world with sales of $103 billion and net income of $5.65 billion. Mobil is the second largest industrial company. Mobil has sales of $63.7 billion and net income of $3.27 billion. The comparable figures for Marathon are $8 billion and $379 million. The total sales of the 13 largest oil companies are $421 billion. The oil industry dwarfs other major industries of the country in size and profits.

### 2. *Concentration*

In terms of dollar volume, motor gasoline is the largest end product produced by the oil companies. The parties agree, and the District Court found, that the market in motor gasoline is the most significant "line of commerce" affected under section 7. A merger between Mobil and Marathon would produce market shares or concentration ratios for motor gasoline in various geographical markets of the country as follows: 50% in Muskegon, Michigan; 44% in Green Bay, Wisconsin; about 27% in Toledo and Columbus, Ohio; 20.44% in the State of Michigan; 17.80% in the State of Illinois; 17.44% in the State of Wisconsin; 17.13% in the State of Indiana; 16.7% in the State of Ohio; and 10% in the nation as a whole.

It seems clear that there are many geographical markets and submarkets for motor gasoline in the country. The District Court did not err in analyzing concentration ratios in defining relevant markets by state rather than limiting its consideration to the nation as a whole. On remand, the District Court will have an opportunity to further define and describe the relevant geographical markets and submarkets.

Mobil's main contention, and the argument of its economic expert, is that "motor gasoline prices in the nation tend to approach uniformity with due regard for transportation costs." They conclude from this that the country as a whole is the only relevant market. The District Court noted that this argument overlooks the evidence adduced by Marathon's economic expert of local price variations that transportation costs do not explain and the finding of the District Court that "the persistence of price differentials in various areas of the nation

demonstrates that motor gasoline does not move from area to area in response to price changes easily or as steadily as Mobil asserts." Mobil's theory does not explain why the parties in the actual operation of their business collect and analyze information and plan pricing and marketing strategies on the basis of states and metropolitan areas, as well as nationally and internationally.

Finally, the evidence shows that Marathon does not do business in approximately 28 states, and it is difficult to include within the relevant geographical market those states in which Marathon does not compete with Mobil. *See United States v. Marine Bankcorporation, Inc.*, 418 U.S. 602, 621–22, 94 S.Ct. 2856, 2869–70, 41 L.Ed.2d 978 (1974).

### 3. *Elasticity of Demand*

Professor George Stigler of the University of Chicago Department of Economics, Mobil's main outside expert witness, testified:

> Two things enter the interpretation of a concentration ratio. One, what level do we worry about? And I must say that we have no precise point which is a critical point at which you must worry. And secondly, what is the elasticity of demand facing the industry we are talking about? (App. 2220.)

This is the same basic point that Professor Areeda makes: "Market power ... is a matter of degree measured by the responsiveness (or 'elasticity') of buyer demand to price changes." *Antitrust Analysis*, § 229 (2d ed. 1974). Although Professor Stigler did not testify about the responsiveness of demand to price change in the oil business, other portions of the record indicate that the demand for crude oil and gasoline is relatively inelastic. Since the Arab oil embargo in 1973 the price of crude oil has risen from $3.00 a barrel to $35.00 a barrel, a ten-fold increase in price; and demand has declined only moderately. Likewise, gasoline prices over the same period have risen more than three fold, but demand has remained relatively constant. Where demand is unresponsive to price in a large industry on which the nation is dependent for its economic health, the courts must be especially vigilant in the enforcement of the antitrust laws for in such an industry competition is more difficult to maintain.

### 4. *Barriers to Entry*

The petroleum industry is characterized by high barriers to entry because of capital requirements. For example, Marathon's last refinery in Louisiana cost $700 million to build, and the cost figure would now be around $1 billion. It is unlikely that a new vertically integrated oil company would enter the market to take Marathon's place as a competitor and supplier for independent dealers. The cost of exploration, drilling and production and the cost of facilities for refining and distribution are great. Mobil's own documents show that new entry is "prohibitively expensive." (App. 2064.)

### 5. *Joint Operations in the Oil Industry*

The testimony below clearly indicates that the oil industry is characterized by a complex set of close working relationships: joint ventures for crude oil exploration and production; joint operation of pipelines and transportation; exchange agreements under which the companies swap among themselves crude oil and refined products from one location or terminal to another. Marathon's expert testified:

### REDIRECT EXAMINATION OF FREDERIC M. SCHERER
BY MR. McCARTAN:

Q. Dr. Scherer, Mr. Murphy asked you several questions about concentration in the oil industry.

I want to ask you whether, based upon your studies of American industry in general, are you aware of any industry which has as many partnerships and joint venture arrangements among the largest companies in the industry as the petroleum industry?

A. No, sir. I am not aware of any, and I have looked very hard for alternative examples, and I never have been able to find one.

Q. At what level and function phases of the operation in the petroleum industry do you find these joint ventures and partnership arrangements?

A. Certainly at the crude level, and certainly at the pipeline level, and after that things get into the realm of semantics.

. . . .

Q. And you also have arrangements called processing arrangements?

A. Oh, yes.

For example, if somebody were shutting down a catalytic cracker, and then they were going to lack the capacity for three months, and they would go to an adjacent refinery owned by a competitor, and they would ask, "Will you do our cracking for us during this period while our cracker is down, and when your cracker is down, we will reciprocate."

You have those arrangements, too, yes, sir.

Q. So is it true that the industry at every level from crude exploration right down to terminals, they have such interdependent relationships and arrangements among large companies?

A. Yes; there are all kinds of joint ventures and swaps and horizontal trades and the like at all levels.

. . . .

## RECROSS–EXAMINATION OF DR. FREDERIC M. SCHERER

### BY MR. SAMUEL MURPHY:

Q. Does Marathon, that you know of, engage in—I think your language was swaps, horizontal trades, and joint ventures, of the kind that Mr. McCartan asked you about on redirect examination?

A. Yes, sir, certainly, yes.

Certainly swaps, and certainly joint ventures on pipelines, and I don't know about refinery operations.

Q. The zillions of exchanges that you referred to are exchanges, are a way in which a supplier can participate in a market despite the fact that he does not himself have a producing plant there?

A. They are one way, but I never really have been able to figure out why the use of exchanges is so prevalent.

If somebody at Point A has supply that they are willing to give to Company X on a swap, why aren't they willing to sell it directly to Company X? I never quite understood that. (App. 503–10.)

Moreover, the President of Mobil, along with the representatives of several other major oil companies, sits on the Board of Aramco in Saudi Arabia where he advises and apparently influences to some extent the pricing and output policies of the Saudis, the price leader and dominant member of the OPEC cartel.

### 6. Benefits

Mobil Corporation did not convince the District Court that the merger would benefit the economy, increase operating efficiency, bring advantages of scale, or substitute better management. Mobil's reasons for the acquisition, according to the testimony of its President, Mr. Tavoulareas, and others, seem to be that Marathon stock was underpriced in the market and that Marathon's valuable Yates Field in Texas would provide Mobil with additional needed domestic crude oil reserves. We do not see that it is of particular benefit to the national economy to substitute Mobil ownership of the Yates Field for Marathon ownership, and it may be disadvantageous. It may reduce Mobil's incentives to explore and find its own new domestic reserves.

In addition, as the District Court found, since Marathon operates on a retail basis primarily through independent dealers and private brand outlets and Mobil does not, the merger could eliminate or reduce the healthy competitive effect that independent dealers and multiple private brands have on the retail market for motor gasoline. Any conceivable benefits are more than offset by the potential elimination of Marathon as a supplier of price conscious independents. On this subject the District Court found:

Approximately, 15 percent of Marathon's total gasoline sales are made to independent branded jobbers, branded distributors and branded dealers in the states of

Illinois, Indiana, Kentucky, Michigan, Ohio and Wisconsin. This gasoline is eventually resold at retail under the Marathon brand. The remaining 85 percent of Marathon's gasoline sales are made by its Wholesale Marketing Division at a terminal rack price or tankwagon price. All such sales are unbranded and are made in the following estimated quantities to the following three (3) categories of customers: (1) 10 percent of Marathon's gasoline sales are made to seven (7) companies in which Marathon owns a minimum 50 percent equity interest; (2) 25 percent of Marathon's total gasoline sales are made to the Emro Marketing Company, a wholly owned subsidiary of Marathon which resells at retail under the Gastown, Speedway, Bonded and Consolidated brands; and (3) 50 percent of Marathon's total gasoline sales are made to over 1100 independent businesses which resell either at wholesale or retail prices. Approximately 60 percent of all gasoline sold by Marathon is eventually resold at retail prices that are generally several cents per gallon below that sold in Mobil branded outlets.

*Marathon Oil Co. v. Mobile Corp.,* 530 F.Supp. 315, at 318 (N.D.Ohio 1981). Based on Mobil's past practice of selling gasoline only through Mobil stations, it seems unlikely that Mobil would continue to service the independents in times of shortage.

### 7. Conclusion

The foregoing factors when considered together lead us to the firm conclusion that the District Court did not err in finding a strong probability that Mobil's proposed acquisition of Marathon violates the antitrust laws. The industry is extremely large in size and the market shares of the two companies represent huge dollar figures. The concentration ratios of the two companies in relevant markets and submarkets range from 10% to 20%. These market shares are within the range that economists and the Antitrust Division of the Department of

Justice believe confer market power and lead companies to charge monopoly prices and engage in other uncompetitive behavior. There is evidence that this market power would be reinforced by the relative inelasticity of demand for gasoline and the difficulty of entry into the business. Indeed the many joint arrangements and operations in which members of the industry engage already may provide the opportunity for collusion on price and output. Concentration of this economic power in fewer hands in such a large industry with these characteristics increases the risk of uncompetitive behavior and ultimately, may undermine the confidence of the public in the free market system. The District Court's view of the probable illegality of this particular merger is supported by the fact that the competitor to be eliminated is a substantial independent alternative source of supply of crude oil and motor gasoline for independent dealers, who are the most competitive factor in the industry at the wholesale and retail levels.

We also conclude that the District Court did not abuse its discretion in rejecting Mobil's proposed "hold separate order" which was orally advanced after the preliminary injunction was granted.

We hold that the findings of fact entered by Judge Manos are not clearly erroneous. Generally, but without endorsing all of his reasoning, we accept his conclusions of law. This record shows that Marathon has been a substantial supplier of independent gasoline marketers (60% of all motor gasoline sold by Marathon is eventually resold at retail prices below Mobil's. *E.g., Marathon Oil Co. v. Mobil Corp.,* 530 F.Supp., at 318 (N.D.Ohio 1981); App. 1534–35 (affidavit of G. Norman Nicholson, Vice President for Marketing, Marathon Oil Co.)). Our prime concern is the preservation of some competition in this market, which a dismembering of Marathon could damage. Therefore, because of the likelihood, as found by the District Judge, of the finding of violation of antitrust laws being made after the hearing on the petition for a permanent injunction[1]

---

1. On this record, we believe that there is a strong probability of such a finding.

the Mobil Corporation stands enjoined from purchasing shares of the Marathon Oil Company until and unless Mobil is freed from temporary injunctive relief after full trial at the District Court level, or unless the effectiveness of this order is stayed or overruled by the Supreme Court of the United States.

Accordingly, the judgment of the District Court is affirmed.